J. Harvey Curtis, Jr., and Betty J. Curtis v. Commissioner.
Curtis v. Commissioner
Docket No. 92485.
United States Tax Court
T.C. Memo 1966-33; 1966 Tax Ct. Memo LEXIS 242; 25 T.C.M. (CCH) 206; T.C.M. (RIA) 66033; February 23, 1966
*242 George M. Burgh, for the petitioners. Lawrence A. Wright, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in income tax for the calendar year 1957 in the amount of $8,978.08. The sole issues for decision are whether petitioner J. Harvey Curtis, Jr., received capital gains or ordinary income in that year under an agreement and release entered into with certain other parties, and how much was received. Some facts are stipulated. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners are husband and wife and reside in Worcester, Massachusetts. They filed a joint Federal income tax return for the calendar year 1957 with the district director of internal revenue at Chicago, Illinois. J. Harvey Curtis, Jr., will be referred to as petitioner or as Curtis. J. Harvey Curtis, Inc., hereinafter referred to as the company, was a Massachusetts corporation engaged in the insurance business in Worcester. Prior to November 25, 1953, petitioner was the sole stockholder. Charles E. Kinkade, of Boston, in October and November 1953 *243 negotiated with petitioner looking toward a sale to Kinkade of all the company's stock. On November 25, 1953, petitioner and Kinkade entered into an agreement for the sale of the stock to Kinkade. The agreement provided: 1. Forthwith and upon the execution of this agreement, Curtis will sell, assign, transfer and deliver unto Kinkade, or his nominee, all the outstanding capital stock of the Company free and clear of all encumbrances, and will deliver to Kinkade resignations in writing of all the present officers and directors of the Company. 2. Curtis represents, warrants and covenants that the Balance Sheet of the Company attached hereto and Marked "A" is a true and accurate statement in all respects as of the date thereof, that the accounts receivable as shown thereon are valid, legal and collectible claims of the Company and that the accounts payable and other obligations as shown on said Balance Sheet constitute and include all the liabilities of the Company, contingent or otherwise. Curtis also covenants and agrees that if there are liabilities of the Company in excess of, or in addition to, those shown on said Balance Sheet, the amount of such excess or additional liabilities *244 may be deducted from any sums at any time due or becoming due Curtis from Kinkade or otherwise, but Curtis shall be permitted to take whatever steps he deems necessary to resist or defend against such excess or additional liabilities. And Curtis further represents, warrants and covenants that between the date of said Balance Sheet and the date herof [hereunder] the Company has been operated in such a manner that there have been no changes in said Balance Sheet other than changes therein resulting from the operation of the Company in the usual course of business. The obligation and representations of Curtis hereunder shall be continuing obligations and representations and shall not merge in the performance of any one or more obligations or acts hereunder but shall survive the same. 3. Kinkade will pay Curtis the sum of Twelve Thousand Dollars ($12,000.00) for said stock as follows: (a) Upon the delivery by Curtis to Kinkade, or his nominee, of all the outstanding shares of stock of the Company duly endorsed for transfer in blank, with appropriate transfer stamps affixed thereto, Kinkade will pay to Curtis the sum of Eleven Thousand Dollars ($11,000.00). (b) On April 1, 1954, Kinkade *245 will pay to Curtis the balance of One Thousand Dollars ($1,000.00) less an amount equal to the face amount of those accounts receivable of the Company on the date of this agreement which the Company has on or before said April 1, 1954 determined to be uncollectible; and Kinkade will thereupon cause said uncollectible accounts to be assigned to Curtis for such action as Curtis may wish to take thereon. 4. This agreement shall be binding upon, and shall enure to the benefit of, the heirs, administrators, executors and assigns of the parties hereto. Also on November 25, 1953, petitioner entered into an employment agreement with the company which provided: 1. Curtis will be employed by the Company for a period from the date hereof until October 31, 1959. 2. From the date hereof until October 31, 1954 (said period being hereinafter referred to as the "First Period"), Curtis will be employed by the Company and will solicit and negotiate for and on behalf of the Company all kinds of insurance business and will give faithful, honest and diligent service to the performance of such duties and services as may be specified from time to time by the Company's officers and Board of Directors. *246 3. During the term of this agreement from November 1, 1954 to and including October 31, 1959 (said period being hereinafter referred to as the "Subsequent Period"), Curtis will from time to time render to the Company such reasonable consulting, advisory and other services in connection with the management and conduct of the Company's insurance business as is required by the Company and will assist the Company in carrying on its insurance business; it being expressly understood and agreed, however, that in rendering such services Curtis shall not be required to maintain any regular office hours either at the Company's office or elsewhere, but shall be generally available to devote to the Company's business such time to such consulting, advisory and other services as the Company may reasonably request. 4. During the First and Subsequent Periods of employment, the Company agrees to pay Curtis for the performance of his duties and services, as above specified, the aggregate of the following sums: (a) Five per cent (5%) of the earned premiums on all automobile liability insurance and eight per cent (8%) of the earned premiums on all other insurance business written by the Company *247 for customers that were customers of the Company as of the date of this agreement, including renewals thereof and increases therein, but excluding insurance business emanating from subagents and/or insurance brokers, and excluding life, group, pension insurance and such insurance business as the Company shall declare to involve a special risk. (b) Ten per cent (10%) of the earned premiums on all insurance business written by Curtis through the Company for customers who were not customers of the Company as of the date of this agreement, but excluding insurance business emanating from subagents and/or insurance brokers, and excluding life, group, pension insurance and such insurance business as the Company shall declare to involve a special risk. (c) Fifty per cent (50%) of the net commission on all life, group, and pension insurance and on insurance declared by the Company to involve a special risk written by Curtis through the Company. 5. During the First Period of employment only, the Company agrees to pay Curtis an expense account not exceeding Fifty Dollars ($50.00) per week for expenses incurred by Curtis in the ordinary course of his employment hereunder based on written *248 vouchers submitted by Curtis. * * *
8. Unless earlier terminated by the mutual consent of the parties hereto, this agreement will terminate on October 31, 1959 except as to payments due Curtis for the quarter ending October 31, 1959 and except as to the provisions of paragraph 10 hereof which shall continue forever and except as to the provisions of paragraph 11 hereof which shall continue for a period of five (5) years after the termination of Curtis' employment hereunder. In the event of the death of Curtis prior to the termination of this agreement, as above set forth, the Company will continue to pay to the estate of Curtis the sums provided for herein at the times and in the manner herein provided. * * *
10. Curtis will never disclose to any person, firm or corporation any information concerning the business or affairs of the Company which he now has or may acquire in the course of or as incident to his employment hereunder for his own benefit or to the detriment or intended or probable detriment of the Company and will never solicit those persons who are customers of the Company on October 31, 1964 other than for the Company's account. 11. After the termination *249 of his employment hereunder, Curtis will never engage directly or indirectly in the insurance business or work for any individual, firm or corporation engaged in such business or similar business within a radius of fifty (50) miles of said Worcester, for a period of five (5) years from the date when his employment under this agreement or any extension thereof terminates, and for said period of five (5) years Curtis will not directly or indirectly either in person or as a stockholder in, or as an employer, employee or member of, any partnership, association, or corporation, or otherwise, solicit any accounts of the Company or any accounts brokered with the Company, and which have been handled by the Company during the term of this agreement no matter where any of said accounts may be located. 12. Forthwith upon the execution and delivery of this agreement, Curtis will either (a) deliver to the Company insurance policies upon his life in the aggregate sum of Sixty Thousand Dollars ($60,000.00) with endorsements thereon designating the Company as the beneficiary thereof and with all premiums to date paid thereon, or (b) permit the Company to take out new insurance on his life in said *250 sum payable to the Company and do all things reasonably necessary or appropriate for the issuance of such insurance. Upon the delivery of such insurance policies or upon the issuance of such new insurance, as the case may be, the Company will pay all premiums on such insurance thereafter becoming due. 13. Until October 31, 1959, the Company will cause itself to maintain its corporate identity and until said time will not consolidate or merge with any other business entity or do anything that will result in its losing its identity as a separate corporation. 14. This agreement shall be binding upon, and enure to the benefit of, the heirs, executors, administrators and assigns of Curtis and the successors and assigns of the Company. The agreement was signed for the company by Kinkade as an officer thereof. Also on November 25, 1953, petitioner signed a promissory note to the State Street Trust Company, of Boston, for $23,000 to be paid in quarterly installments of $1,600 commencing May 15, 1954, and a final installment of $600 on November 15, 1957, with interest at 4 1/2 percent. Petitioner also assigned to State Street Trust Company as security for the note all moneys to become *251 due him under the foregoing employment agreement with the company. Kinkade or Kinkade & Company, Inc., a Massachusetts corporation, guaranteed repayment to the trust company of the loan. After November 1953 and before March 1957, certain amounts were paid by the company to petitioner. Petitioner, believing that he had not received the money required to be paid to him under the employment contract, consulted attorneys in Worcester who, in 1957, prepared a petition for the purpose of commencing a suit. Before the action was filed a settlement was negotiated. On March 9, 1957, an agreement and release was signed by petitioner (referred to therein as Curtis) and Kinkade, the company, and Kinkade & Company, Inc. (referred to as parties of the second part), which provided: WHEREAS, Curtis has brought an action or actions against the parties of the second part; WHEREAS, Curtis and J. Harvey Curtis, Inc. are parties to an Employment Agreement dated November 25, 1953; and WHEREAS, Curtis has claimed that there are various other agreements which have been made between him and one or more of the parties of the second part; and WHEREAS, Curtis and the parties of the second part *252 desire to settle all disputes and to terminate all obligations between them except those set forth herein and in a Non-Competition Agreement executed this date; NOW, THEREFORE in consideration of the mutual promises of the parties to this agreement herein contained, it is mutually covenanted and agreed as follows: (1) The Employment Agreement between Curtis and J. Harvey Curtis, Inc. dated November 25, 1953, is hereby terminated and all obligations of either party are hereby cancelled. All other agreements between Curtis and the parties of the second part, or between Curtis and any of them or any combination of them, whether oral or in writing, are hereby terminated, and all obligations of either party are hereby cancelled, excluding only the Non-Competition Agreement executed this date. (2) Curtis does hereby remise, release and forever discharge the said parties of the second part and each of them of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages and any or all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity which against the said parties of the second part and *253 each of them, or their heirs, successors, administrators, executors, and assigns, which the said Curtis now has or ever had from the beginning of the world to this date. There is excluded from the foregoing only the obligation under the Non-Competition Agreement of even date to make payments totaling Four Thousand Dollars ($4,000). (3) The parties of the second part, and each of them, hereby remise, release, and forever discharge the said Curtis of and and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which against the said Curtis or his heirs and assigns which they now have or ever had from the beginning of the world to this date, excluding only (a) the Non-Competition Agreement executed this date, and the obligations herein contained, (b) any claims by the parties of the second part on account of fraud or embezzlement, or under the provisions of Paragraph (6) hereof. (4) The parties of the second part have concurrently with the execution of this agreement paid to said Curtis the sum of Eleven Thousand *254 Five Hundred Dollars ($11,500) in six (6) checks made up as follows: One check in the sum of Six Thousand Five Hundred Dollars ($6,500); and five checks in the sum of One Thousand Dollars ($1,000) each. The receipt of said sum of Eleven Thousand Five Hundred Dollars ($11,500) is hereby acknowledged. (5) Curtis assents and agreed to the cancellation by the parties of the second part or by any of them, of all insurance policies wherein he and/or his wife are the assured, issued or renewed by or through any of the parties of the second part on or after January 1, 1957. It is agreed that any amounts received back as return premiums or otherwise on account of the cancellation of these policies shall be considered the property of the party of the second part cancelling the policy. It is agreed and understood that the parties of the second part have no obligation to renew any of the existing policies wherein Curtis or his wife are the assured. (6) Curtis warrants that he has not received and failed to pay over to the parties of the second part or any of them any amounts received by him from customers on account of insurance premiums or otherwise. (7) Kinkade & Company, Inc. assumes *255 and agrees to pay the note of Curtis to the Second Bank-State Street Trust Company to the extent that it is obligated on that note as a guarantor. (8) This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of Curtis and of the parties of the second part. Also on March 9, 1957, petitioner entered into a noncompetition agreement with the company and Kinkade & Company, Inc., to refrain from engaging in the insurance business within 50 miles of Worcester before October 31, 1964, and the companies agreed to pay him $4,000 in installments - $1,000 before December 31, 1957, the remainder in later years. In the settlement effected through the agreement and release dated March 9, 1957, petitioner received $11,500 in checks and was released of indebtedness for uncollectible receivables for premiums of insurance and of further liability for the note given to State Street Trust Company. Also released was petitioner's liability to the company for premiums on insurance written for his personal requirements which were to have been debited to any money due him. The amounts released related to accounts charged in the years *256 1953 to 1957, as follows: 1953
$ 984.08
1954
1,540.09
1955
2,628.76
1956
4,914.47
1957
2,783.38
The return for 1957 filed by the petitioners reported compensation received from the company of $3,390.84, compensation of petitioner from a Chicago employer in the amount of $8,747.69, and compensation received by Betty from an employer in Evanston, Illinois, of $1,359. Other income was reported of $1,000 from the company and of $647.15 from life insurance commissions. Deductions claimed included interest paid to various banks or finance companies of Worcester, but none to State Street Trust Company, of Boston. The benefits derived by petitioner in 1957 from the agreement and release resulted in the receipt of $24,350.78, taxable as ordinary income. Opinion Respondent's position is that the petitioner received ordinary income in 1957 as a consequence of the agreement and release which he then executed with his employer, and that such income was in the amount of $11,500 in cash admittedly received, plus the forgiveness of indebtedness in the amount of $12,850.78, making an aggregate of $24,350.78. The petitioner contends that all the amounts received and *257 indebtedness forgiven should be treated as capital gains since they represented payments upon the purchase price of his stock in the company which he sold in 1953 to Kinkade. He says that at the time of the 1953 transaction his stock was subject to a lien for a debt of some $20,000 to $23,000 owed by him to W. Roy Carrick or the Carrick Agency, and that Carrick was a former stockholder whose shares petitioner had purchased, and who was pressing a claim against petitioner for the balance due. To transfer the stock to Kinkade it was necessary to pay this debt. Petitioner says that he was not acquainted at the State Street Trust Company and that Kinkade arranged with the trust company for a loan of $23,000 to petitioner and that Kinkade guaranteed repayment to the trust company. Petitioner says the purchase price obviously included the $23,000 necessary to pay off this loan as well as the $12,000 in cash, since he would not pay $23,000 to release the lien and then sell the stock for only $12,000. He says, also, that the employment contract was intended as a device to enable Kinkade to charge part of the purchase price of the stock as a deductible expense of the corporation and not as *258 a true contract of employment. According to the petitioner, the only money he received under that contract was in quarterly payments of the exact amounts required to meet the installments on the note. Usually he received a check from the company and sent his own check in the same amount to the trust company, but on at least three occasions the company paid the lender directly. Petitioner points to various provisions of the contract as evidencing that it is not a contract for services - for example, it required payments to his estate if he dies; it was to be binding on his heirs and assigns; it called for insurance on his life in favor of the company; the company was to maintain its corporate identity until October 1959; and it was to pay him commissions on all business written for customers who were customers as of the date of the agreement. These provisions call for payments regardless of services and, according to petitioner, show that the contract was related to the sales contract and that the two should be considered together as being the sales agreement. The sales contract also refers to sums becoming due petitioner from Kinkade, or otherwise. From this, petitioner argues *259 that the payments made under the so-called "employment contract" represent payments on the purchase price of the stock. Also, amounts charged to him for accounts receivable found uncollectible, which he had guaranteed, should be treated as a reduction in the selling price of the stock. In 1957 the petitioner concluded that he was not receiving the money required to be paid to him under the agreements and prepared to take legal action against Kinkade, whereupon a settlement was negotiated. Petitioner contends that the agreement then effected was an amendment of the 1953 sales contract and that the moneys paid him thereunder and the indebtedness forgiven constituted further payments for the stock he sold in 1953 and should be treated as capital gains. Petitioner contends further that there was no real indebtedness from him to Kinkade or to the company to be forgiven, that no such indebtedness had ever been created, but that at all times there was money owing to petitioner as part of the purchase price of the stock. The petitioner further contends that the allocation of the sum of $24,350.78 to income for the year 1957 was erroneous. This consists of $11,500 admittedly received and *260 $12,850.78 of debts forgiven. Petitioner says that the amounts forgiven, if received, were received over a period of five years, 1953 to 1957, both inclusive. Petitioner also says that respondent has never shown what portion of this was owed to Kinkade, or to the company, or to Kinkade & Company, Inc., and that amounts which he may have owed for insurance premiums for years prior to 1957 which were debited against money owed him by the company or by Kinkade should have been treated as income to petitioner in the earlier year. The burden of proof is upon the petitioner. Tax Court Rule 32. There are several difficulties in accepting petitioner's arguments. In the first place, the 1953 contract which petitioner signed is headed "EMPLOYMENT AGREEMENT;" it provides that until October 31, 1954, petitioner "will be employed by the Company and will solicit and negotiate for and on behalf of the Company all kinds of insurance business and will give faithful, honest and diligent service to the performance of such duties and services as may be specified from time to time by the Company's officers and Board of Directors;" and it further provides that "the Company agrees to pay Curtis for the *261 performance of his duties and services, as above specified * * *" certain sums. [Emphasis supplied.] Thus, the contract called for the performance of services and for payments for such services. Although services other than consulting and advisory were not required in the following years of the contract period, petitioner in his tax return for 1957 reported compensation of $3,390.84 as received from the company, indicating that he was still receiving commissions under the contract in that year and was treating the amounts as payments for services rather than as purchase price for stock. This return was filed in 1958, after the settlement agreement of 1957. There is no corroboration of petitioner's statement that the contract was intended as something other than a contract of employment. We might agree with the petitioner's views that the accounts receivable found uncollectible and charged to him represent a reduction in the selling price of his stock, and that the payment of the indebtedness upon the stock in 1953 constitutes a part of the price and should be treated as capital gains, except for the fact that petitioner has presented no proof of the existence or the amounts of *262 either of these items. There is no indication of the amount of accounts receivable charged to him. There is no evidence to support his statement that there was such a debt owed Carrick, and petitioner was indefinite as to the amount of any such alleged obligation. The amount he may have owed Carrick in 1953 was not necessarily equal to the amount he borrowed from the trust company. Next, we have no evidence to show how much of the alleged $23,000 loan had been paid by March 9, 1957, before the settlement. We have no information to show how much the company owed petitioner for commissions under the contract, or whether such amount was in excess of the installments paid on the note. Furthermore, petitioner testified that some of the indebtedness forgiven in the settlement in 1957 represented insurance premiums on his own personal business. The forgiveness of this would be ordinary income to petitioner and there is no evidence to show how much of the indebtedness was in this class. The argument that some of the amounts forgiven were income in earlier years, if income at all, mistakes the nature of the 1957 contract. We may assume that petitioner had an open account with the company; *263 that he was charged with net premiums on his personal business insurance and with accounts found uncollectible by the company, the payment of which he had guaranteed, and was credited with commissions accruing to him under the employment contract; and that at the time of the settlement in 1957 there was a balance owing to the company. When this balance was forgiven in 1957, the petitioner realized income then. There is no evidence to warrant a finding that petitioner derived income in an earlier year from the settlement in 1957. As mentioned above, the burden of proof is upon the petitioner to prove error in the respondent's determination. That determination is presumed to be correct. Petitioner was the only witness. His testimony was ambiguous, inconclusive, imprecise, and uncorroborated. Except for that testimony there is no evidence to show the amount he owed Carrick in 1953, the amounts he owed Kinkade or Kinkade owed him in March 1957, and the character of such indebtedness, the balance then owed on the note to State Street Trust Company, or what part of the indebtedness forgiven represented uncollectible receivables and what part was for insurance premiums on his own business. *264 He failed to call Kinkade or Carrick or any other person acquainted with the facts as a witness, or the accountant who prepared his tax return. He failed to produce, or satisfactorily explain the absence of, records to substantiate his statements. We have considered the petitioner's contentions, but he has not persented evidence sufficient to overcome the presumptive correctness of the respondent's determination. Decision will be entered for the respondent.